Randall A. Peterman, ISB No. 1944
Alexander P. McLaughlin ISB No. 7977
GIVENS PURSLEY LLP
601 West Bannock Street
Post Office Box 2720
Boise, Idaho  83701
Telephone  (208) 388-1200
Facsimile  (208) 388-1300
rap@givenspursley.com
alexmclaughlin@givenspursley.com
013448-0011

Attorneys for Banner Bank

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>WELLS ALAN WYATT,<br><br>　　　　　Debtor. | Case No. 17-40973-JMM<br>Chapter 7 |
| BANNER BANK,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>WELLS ALAN WYATT,<br><br>　　　　　Defendant. | Adversary No. 18-08006-JMM |

**PLAINTIFF'S PRETRIAL MEMORANDUM**

   COMES NOW Banner Bank, by and through its counsel of record, Givens Pursley LLP, and hereby submits this Pretrial Memorandum.  This Pretrial Memorandum is split into three parts: (a) an introduction; (b) the background of the case and a brief statement of the

**PLAINTIFF'S PRETRIAL MEMORANDUM - 1**　　　　　　　　　　　　　　　　14662585.3

facts that Banner Bank will adduce at trial; and (c) the legal authority pertinent to the remaining four Counts of Banner Bank's Complaint.

## I.     INTRODUCTION

The nondischargeability Complaint in this Adversary Proceeding was filed by Banner Bank on February 14, 2018.  CR 1.  Wells Wyatt ("Debtor" or "Wyatt") filed an answer, after which substantial discovery ensued.  CR 10.  On January 18, 2019, Wyatt filed a motion for summary judgment as to all six Counts in the Complaint, which was granted in part and denied in part.  CR 43, 77.  More specifically, summary judgment was granted as to Count 1 and Count 3; summary judgment as to the remaining Counts 2, 4, 5, and 6 was denied.  *Id.*

## II.     BACKGROUND OF THE CASE

**A.     The Wyatt and Candice Cooley Relationship.**

Candice Cooley ("Cooley") will testify that her entire business background is related to trucks and trucking, mainly in moving livestock across the country.  The trucking business was eventually undertaken under an entity that Cooley controlled known as Patrone Livestock, LLC ("Patrone").

Cooley moved to Twin Falls in 2008, and met Wyatt in 2009, when the two became romantically involved.  Wyatt moved in with Cooley in 2009 after his wife learned of the romantic relationship.  Cooley and Wyatt separated and then parted ways in 2016.

Cooley will prove to be a critical witness.  She was the bookkeeper for Wyatt Livestock, Inc. ("Wyatt Livestock").  Cooley was also a co-owner and bookkeeper for Wyatt Feeding LLP ("Wyatt Feeding").  She assisted Wyatt in preparing the critical borrowing base certificates ("BBCs") and submitted them once a month to Banner Bank, as to loans it made to

**PLAINTIFF'S PRETRIAL MEMORANDUM - 2**

14662585.3

both entities. Cooley's sworn testimony is diametrically opposed to that of Wyatt as to almost all significant issues of fact.

    **B.**    **The Wyatt/Timmerman Relationship.**

At trial Banner Bank will prove the following background facts of the case.

Wyatt Livestock and a group of individuals and entities from the Midwest known as the Timmermans (collectively "Timmermans") had been parties to a joint venture since 2003. There was no written agreement, just a series of oral joint venture agreements. The parties' relative interests in the joint venture livestock were reflected in part in the BBCs that Wyatt Livestock prepared, signed, and delivered monthly to Banner Bank under the loan documents. Wyatt created two entities (a) Wyatt Livestock, an Oregon corporation formed in June 2007; and (b) Wyatt Feeding, an Idaho limited liability partnership formed in July 2013. The principal business of Wyatt and his two entities was to operate a joint venture with the Timmermans.

    **C.**    **The Course of Dealing Between Wyatt and Timmerman.**

At trial Banner Bank will establish the course of dealing between Wyatt and Timmerman as follows:

- Wyatt Livestock would purchase young cattle for the joint venture in early spring, and bring them to the Wyatt Feeding feedlot in Idaho, then put them to pasture in Nevada. The Timmermans would pay the cost of pasturing. Brand inspections were undertaken when the livestock crossed state lines.

- There would consistently be a period of at least two days from Wyatt Livestock's purchase of the livestock with Banner Bank loan proceeds, to when Wyatt Livestock would be reimbursed for that purchase by the Timmermans. During this window of time the perfected security interest of Banner Bank would attach to all such livestock. Those cattle would be purchased with funds from an operating loan that Banner Bank had provided Wyatt Livestock. The Timmermans were fully aware of this.

- Wyatt Livestock would then be reimbursed by the Timmermans for the cost of the purchase of the cattle. However, during the last two or three

**PLAINTIFF'S PRETRIAL MEMORANDUM - 3**

years of the parties' relationship, Wyatt Livestock would not apply the reimbursement from the Timmermans to the Banner Bank loan. Instead, Wyatt would use the proceeds to pay for other deals with the Timmermans.

- After pasturing by Wyatt, the joint venture cattle would be pastured, fed, fattened, and then slaughtered by the Timmermans. Some trucking services for the movement of the joint venture cattle would be provided by Patrone.

- The Timmermans would have the joint venture cows slaughtered, with net proceeds being split (for the most part on a 50/50 basis) between Wyatt Livestock and the Timmermans.

- The joint venture "deal" was, as stated by Wyatt, "[j]ust say it was a 50% ownership in—50 percent equity or—in the livestock." It was a "profit sharing program." Net proceeds would be determined solely by the Timmermans by computing the gross value obtained from slaughter, less the following costs, which were provided in the form of a "close out sheet."

    - Purchase costs of livestock.
    - Pasturing costs of livestock.
    - Trucking costs.
    - Feeding costs by the Timmermans.
    - Interest for all advances made by the Timmermans.
    - All costs of future trading, which was done totally by the Timmermans.
    - All accounting regarding the joint venture cattle was undertaken by the Timmermans.

**D.    The Banner Bank Relationship with Wyatt Livestock and Wyatt Feeding.**

The testimony will show that Wyatt Livestock funded its joint venture activities with the proceeds of a revolving operation line of $2 million made by Banner Bank, and collateralized by all Inventory, Accounts, Equipment, Crops, Farm Products, Livestock and Farm Equipment. Wyatt Feeding borrowed $500,000 from Banner Bank, and collateralized that loan

**PLAINTIFF'S PRETRIAL MEMORANDUM - 4**

14662585.3

by a subordinate mortgage interest on its feedlot, and a first perfected security interest in certain certificated vehicles, all Inventory, Feed Inventory, Accounts, Equipment, General Intangibles, Crops, Farm Products and Farm Equipment. The Timmermans were aware of the loan and aware of Banner Bank's security interest in the livestock.

### 1. Loan to Wyatt Livestock

A loan was made by Banner Bank to Wyatt Livestock as follows:

- A $2 million revolving line of credit.

- Collateralized by virtually all of the assets of both Wyatt Livestock and Wyatt Feeding, including livestock, farm products, feed, and equipment.

- Supported by monthly borrowing base certificates as to livestock and feed which were prepared, signed, and dated by Wyatt and his girlfriend/accountant Cooley, then submitted to Banner Bank

- Wyatt was the sole shareholder, director and officer of Wyatt Livestock. Wyatt guaranteed all such loans.

### 2. Loans to Wyatt Feeding

Banner Bank made three loans to Wyatt Feeding, which was organized under Idaho law in 2013, with Wyatt and Cooley each owning 50% of the entity.

- A $500,000 promissory note in August 2016;

- A $57,000 promissory note in September 2015; and

- A $95,000 promissory note in September 2015.

**PLAINTIFF'S PRETRIAL MEMORANDUM - 5**                                                                 14662585.3

These loans were collateralized by a mortgage on the entity's sole piece of real property—a feedlot located in Hazelton, Idaho. The loans are also collateralized by virtually all of the assets of Wyatt Feeding, including livestock, farm products, inventory, feed, and equipment. Wyatt is a guarantor of the Banner Bank loans to Wyatt Feeding. Banner Bank's February 12, 2018, Proof of Claim specifically identifies all of the loans and related collateral. Wyatt did not object to Banner Bank's Proof of Claim.

E.  **The Critical BBCs Provided to Banner Bank by Wyatt Livestock and Wyatt Feeding.**

BBCs for both Wyatt Livestock (as to livestock) and Wyatt Feeding (as to feed) were required by the loan documents between Banner Bank and those borrowers, on forms provided by Banner Bank, which required that both borrowers sign and date the documents, and aver to their truth.

The BBCs were critical because they determined, under the formulas reflected in the terms of the parties' loan documents, the extent to which credit could be provided on an ongoing basis to the borrowers. Banner Bank relied upon the accuracy and truthfulness of the BBCs to make its business decisions with regard to its loans to Wyatt Livestock and Wyatt Feeding, and was damaged because of that reliance.

Cooley will provide critical testimony as to Wyatt's falsification of BBCs on a repeated basis between 2009 and 2016.

F.  **Wyatt's Double Financing of Livestock.**

Cooley will further testify that, as to each BBC, Wyatt Livestock represented to Banner Bank that the livestock identified on that document belonged solely to Wyatt Livestock, when in fact they had already been 80% financed by Timmermans. In effect, Wyatt Livestock was "double financing" the same livestock. Wyatt "double financed" the livestock in such a way

**PLAINTIFF'S PRETRIAL MEMORANDUM - 6**                                                  14662585.3

that his life partner, bookkeeper and co-owner of Wyatt Feedlot characterized the BBCs generated by Wyatt as "bold faced lies." This knowledge came to Cooley in 2015, when she discovered that Wyatt Livestock had no equity in 3,800 head of joint venture livestock, despite statements made by Wyatt to the contrary in the BBCs.

G. **Misrepresentations Made by Wyatt Regarding the Extent of the Ownership of Equipment by Wyatt Livestock and Wyatt Feeding.**

Banner Bank will establish at trial through Cooley's testimony that Wyatt Livestock did not even own the equipment that he claimed on his financial statements provided Banner Bank for 2014 through 2017, and that Wyatt Livestock overvalued the equipment identified on the financial statements. She will further testify to various misrepresentations on the financial statements provided Banner Bank as to Wyatt Feeding.

H. **Misrepresentations Made by Wyatt Regarding the Value of Equipment of Wyatt Livestock and Wyatt Feeding.**

Banner Bank will produce evidence at trial, through the testimony of Wyatt, Cooley, or exhibits produced by Wyatt, establishing that he claimed in writing a total value of the equipment of both Wyatt Livestock and Wyatt Feeding in a July 31, 2017, compiled financial statement at over $1,978,812. Banner Bank will produce evidence that the only source of information available to the CPA who prepared that document was Wyatt.

Only two months later, on September 14, 2017, Wyatt provided Banner Bank with two equipment appraisals for Wyatt Livestock and Wyatt Feeding. Banner Bank will establish through Wyatt's testimony that the appraisals represented the equipment remaining at each entity, and their limited value. These three documents, all prepared by Wyatt, clearly establish the fraudulent and untrue statements reflected in this case.

**PLAINTIFF'S PRETRIAL MEMORANDUM - 7**

14662585.3

The 2017 Financial Statement was prepared to trick and defraud Banner Bank into thinking that equipment was worth almost $2 million; the two subsequent appraisals were intended to create "poor boy" values for the Chapter 7 bankruptcy that Wyatt was preparing to file.

I. **Misrepresentations Made by Wyatt in the BBCs Submitted to Banner Bank Under Penalty of Perjury.**

Banner Bank will produce BBCs and Cooley's testimony that the livestock that Wyatt, through Wyatt Livestock, claimed over years of BBCs submitted to Banner Bank simply never existed, or assuming *arguendo* that they did, they were "double financed" and had no value anyway.

J. **Misrepresentations Made by Wyatt in "Double Financing Livestock"**

Candice Cooley's trial testimony will clearly establish that Wyatt, acting through Wyatt Livestock, was "double financing" the cows. Wyatt accomplished this by purchasing cattle, requesting financing from Timmermans for 80% of each cow, and then representing to Banner Bank on the BBC's that Wyatt Livestock was the 100% owner of each such cow.

K. **Misrepresentations Made by Wyatt and Contained in Financial Statements Provided to Banner Bank.**

Wyatt Livestock, Wyatt Feeding, and Wyatt annually provided financial statements to Banner Bank which (a) substantially overstated the net worth of the parties; (b) substantially overvaluing equipment, or claiming an interest in collateral that was nonexistent; and (c) upon which Banner Bank relied.

Cooley will testify that, in preparing financial statements for use by Banner Bank, Wyatt would frequently include as assets trucking equipment, which actually belonged to

**PLAINTIFF'S PRETRIAL MEMORANDUM - 8**

14662585.3

Patrone. These additions falsely and fraudulently increased the assets and net worth of Wyatt and his two entities.

Banner Bank will also produce evidence from Cooley that because Wyatt overstated the net worth of Wyatt Livestock by $1.6 million in that entity's financial statement, he also overstated his own personal net worth in his personal financial statement, signed and sworn by Wyatt, as to his personal net worth of $1.6 million.

L.   **Wells Wyatt's Concealment of Banner Bank Collateral Both Before and After the Bankruptcy Filing.**

Cooley will testify that Wyatt actively concealed the Banner Bank collateral, both pre- and post-petition. These assets were not disclosed on the Debtor's schedules or statements of affairs, and were never provided to Banner Bank.

### III.  LEGAL STANDARD

A.   **Banner Bank's Complaint Count 2: Violation of 11 U.S.C. Section 727(a)(3).**

Count 2 of Banner Bank's Complaint alleges a violation of 11 U.S.C. Section 727(a)(3). With respect to this section, the *Weddell* court (*Weddell v. Landis,* 551 B.R. 74 (D. Nev. 2016) explained:

> Section 727(a)(3) "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs." *In re Caneva*, 550 F.3d 755, 762 (9th Cir. 2008). "[T]he debtor must present sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." *Id.* at 761 (quotations omitted). *The Trustee bears the burden of proving by a preponderance of the evidence that: 1) "the debtor failed to maintain and preserve adequate records, and 2) that such failure makes it not possible to determine the debtor's financial condition and material business transactions." Id.* at 761. "After showing inadequate or nonexistent records, the burden of proof then shifts to the debtor to justify the inadequacy or nonexistence of the records." *Id.* The intent to conceal financial information is not a prerequisite to finding that records are

**PLAINTIFF'S PRETRIAL MEMORANDUM - 9**

> inadequate, nor is a lack of records justified by an honest belief that records do not need to be kept. *In re Cox*, 41 F.3d 1294, 1297 (9th Cir.1994). There is no requirement to prove that a debtor's failure to maintain records be "knowing" or "fraudulent." *In re Knowling*, 2011 WL 5024298 (Bankr.D.Or.2011). In order to justify the fact that records were not kept, Weddell needed to establish that others in like circumstances would not keep them. *Id.* at 763.

*Weddell*, 551 B.R. at 82 (emphasis added) (upholding decision denying discharge where, "The Bankruptcy Court specifically referenced the lack of records evidencing any gun for gold trades or any cash for gold trades with the man known as Leonard. The absence of records relating to these liquid assets, the Bankruptcy Court determined, made it impossible to determine Weddell's financial condition and material business transactions.").

    **B.**    **Banner Bank's Complaint Count 4: Violation of 11 U.S.C. Section 727(a)(5).**

Count 4 of Banner Bank's Complaint is based upon 11 U.S.C. Section 727(a)(5). For this claim, an objecting creditor must show "(1) debtor at one time, not too remote from the bankruptcy petition date, owned identifiable assets; (2) debtor no longer owned the assets on the petition date; and (3) the bankruptcy pleadings or statement of affairs do not reflect an adequate explanation for the disposition of the assets . . . Once this showing is made, the debtor must offer credible evidence regarding the disposition of the missing assets." *In re Poole*, 2017 WL 3598050, at *6 (B.A.P. 9th Cir. Aug. 21, 2017) (citing *In re Retz*, 606 F.3d at 1205); Weddell, 551 B.R. at 83 ("[U]nder Section 727(a)(5) after a creditor makes a *prima facie* showing that an asset existed, but that neither it nor its proceeds can be located, the burden shifts to the debtor to provide a satisfactory explanation for the missing asset.") (quoting *In re Retz*, 606 F.3d at 1205).

The evidence adduced at trial regarding this Count will deal with three types of missing assets: (a) equipment; (b) livestock; and (c) equity that Wells Wyatt claimed in his two entities – Wyatt Livestock and Wyatt Feeding.

**PLAINTIFF'S PRETRIAL MEMORANDUM - 10**                            14662585.3

Wyatt's schedules and statements of affairs do not adequately explain these losses. In fact the losses would be unknown but for the truthful testimony of Cooley.

    **C.**    **Banner Bank's Complaint Count 5: Violation of 11 U.S.C. Section 727(a)(2)(B).**

Count 5 of Banner Bank's Complaint is based upon 11 U.S.C. Section 523(a)(2)(B). With respect to the elements of this claim:

> A party seeking to deny discharge of a debt under this section must establish each of the following elements by a preponderance of the evidence:
>
> (1) a representation of fact by the debtor,
> (2) that was material,
> (3) that the debtor knew at the time to be false,
> (4) that the debtor made with the intention of deceiving the creditor,
> (5) upon which the creditor relied,
> (6) that the creditor's reliance was reasonable, and
> (7) that damage proximately resulted from the representation.

*In re Smith*, 242 B.R. 694, 700 (B.A.P. 9th Cir. 1999) (citing *In re Candland*, 90 F.3d 1466, 1469 (9th Cir. 1996)).

Cooley will testify at trial that Wyatt was intimately involved in preparing and submitting borrowing base certificates to Banner Bank on behalf of both Wyatt Livestock and Wyatt Feeding. Banner Bank will prove that Wyatt swore to the truth of, and signed each of, the BBCs. Banner Bank will also adduce testimony that Banner Bank relied upon the truth of the statements in those documents, and Banner Bank was damaged in each such instance.

    **D.**    **Banner Bank's Complaint Count 6: Violation of 11 U.S.C. Section 523(a)(2)(A).**

Count 6 of Banner Bank's Complaint is based upon 11 U.S.C. § 523(a)(2)(A).

> Under the bankruptcy code, to establish that a debt is nondischargeable on the grounds of fraud under § 523(a)(2)(A), Plaintiffs must prove five elements by a preponderance of the evidence: (1) misrepresentation, fraudulent omission, or deceptive

**PLAINTIFF'S PRETRIAL MEMORANDUM - 11**

    14662585.3

conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct.

*In Re: Mowery*, 591 B.R. 1, 3 (Bankr. D. Idaho 2018) (citing *In re Sabban*, 600 F.3d 1219, 1222 (9th Cir. 2010)).

"A promise made without a present intent to perform satisfies § 523(a)(2)(A), as does a representation which the debtor knew or should have known was outside of the debtor's prospective ability to perform." *In re Laraway*, 2010 WL 3703272, at *6 (Bankr. D. Idaho Sept. 13, 2010).

As to this provision, the evidence presented by the testimony will establish that he claimed a total value of the equipment of both Wyatt Livestock and Wyatt Feeding on July 31, 2017, compiled financial statement at over $2 million, then within two months prepared an appraisal of that same equipment that valued it at less than $450,000.

Wyatt Livestock, Wyatt Feeding, and Wyatt annually provided financial statements to Banner Bank which (a) substantially overstated the net worth of the parties; (b) substantially overvaluing equipment, or claiming an interest in collateral that was nonexistent; and (c) upon which Banner Bank relied.

DATED this 15th day of May, 2019.

GIVENS PURSLEY LLP


By  /s/ Randall A. Peterman
    Randall A. Peterman – Of the Firm
    Alexander P. McLaughlin – Of the Firm
    Attorneys for Banner Bank

**PLAINTIFF'S PRETRIAL MEMORANDUM - 12**

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on the 15th day of May, 2019, I filed the foregoing **PLAINTIFF'S PRETRIAL MEMORANDUM** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

**Patrick J. Geile**
pgeile@foleyfreeman.com
abennett@foleyfreeman.com
r59345@notify.bestcase.com


                  */s/ Randall A. Peterman*
                  Randall A. Peterman

**PLAINTIFF'S PRETRIAL MEMORANDUM - 13**

14662585.3