## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| **In Re:**<br><br>**Wells A. Wyatt,**<br><br>                        **Debtor.** | **Bankruptcy Case<br>No. 17-40973-JMM** |
| **Banner Bank,**<br><br>                    **Plaintiff,**<br><br>**vs.**<br><br>**Wells A. Wyatt,**<br><br>                    **Defendant.** | **Adv. Proceeding<br>No. 18-8006-JMM** |

## MEMORANDUM OF DECISION

**Appearances:**

Randall Peterman, GIVENS PURSLEY, LLP, Boise, Idaho, Attorney for Plaintiff.

Patrick Geile, FOLEY FREEMAN, PLLC, Meridian, Idaho, Attorney for Defendant.

### *Introduction*

Before the Court is an adversary proceeding in which Banner Bank ("Plaintiff")

seeks a determination that the debts owed to it by Wells Wyatt ("Defendant") are either

MEMORANDUM OF DECISION − 1

(1) nondischargeable as to Banner Bank under § 523(a)(2)[1] because of Defendant's

fraudulent statements, or (2) nondischargeable as to Banner Bank because Defendant's

bankruptcy discharge as to all debts should be denied under either § 727(a)(3) or

§ 727(a)(5).  Dkt. No. 1.

Over the course of four days during May and June 2019, the Court conducted a

trial during which the parties presented evidence and examined witnesses.  Dkt. Nos. 97,

98, 103, 104.  The parties then submitted post-hearing briefing, and the matter was

thereafter taken under advisement.  Dkt. Nos. 106, 107, 108, 109.  The Court has

considered the briefing, exhibits, and testimony presented, as well as the applicable law,

and this Memorandum of Decision sets forth the Court's findings, conclusions, and

reasons for its disposition of the adversary proceeding.  Rule 7052.

### *Facts*

*A. Procedural Background*

Defendant has worked in the cattle business for most of his life.  In June 2007, he

organized his own cattle operation as an Oregon corporation known as Wyatt Livestock

(hereinafter, "Livestock").  After Livestock suffered a variety of setbacks and losses,

Defendant filed a chapter 7 bankruptcy petition on November 3, 2017.[2]  Defendant's

primary debts at the time of his bankruptcy filing were owed to Plaintiff for one loan

---

[1] Unless otherwise indicated, all chapter references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532
and all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

[2] Case #17-40973-JMM (Bankr. D. Idaho).

MEMORANDUM OF DECISION – 2

made to Livestock and three other loans made to another entity, partially owned by the

Defendant, known as Wyatt Feeding (hereinafter, "Feeding").

Plaintiff filed its nondischargeability complaint on February 14, 2018, pleading six

separate causes of action against Defendant.  Dkt. No. 1.  In Counts I through IV,

Plaintiff sought revocation of Defendant's bankruptcy discharge under §§ 727(a)(2)

(fraudulent transfer or concealment of property), 727(a)(3) (failure to keep or preserve

adequate records), 727(a)(4) (false oath or account, presentation of false claim, extortion,

bribery, or withholding documents and records from an officer), and 727(a)(5) (failure to

explain loss of assets or insolvency).  *Id.* at 7–9.  In Counts V and VI, Plaintiff asked the

Court to determine that Defendant's debts owed specifically to Plaintiff are

nondischargeable under either § 523(a)(2)(A) (false pretense, false representation, or

actual fraud), or § 523(a)(2)(B) (materially false statement in writing respecting the

debtor's financial condition).  *Id.* at 9–10.

Defendant filed a motion for summary judgment on January 18, 2019.  Dkt. No.

43.  The Court granted Defendant's motion for summary judgment on Counts I and III

under §§ 727(a)(2) and (4), but denied the motion as to Counts II, IV, V, and VI.  Dkt.

No. 77.  Those four surviving counts were the subject of the trial.  On June 11, 2019, at

the end of the second day of trial, Defendant orally moved to dismiss Counts IV, V, and

VI.  Dkt. No. 98.  The Court denied Defendant's oral motion, but during the arguments

on the motion, Plaintiff agreed to withdraw its claims as they applied to Feeding, leaving

only the Plaintiff's claims on Counts II, IV, V, and VI as they related to the Livestock

MEMORANDUM OF DECISION − 3

loan before the Court at the conclusion of trial.  *Id.*  The Livestock loan, also known as Banner Bank Loan No. 4514, is described in greater detail below.

*B. Defendant's Livestock Operations*

    1.  Livestock and the Timmerman Partnership

Defendant was raised on a cattle ranch and has spent most of his adult life raising, buying, selling, and transporting cattle.  Defendant started to buy and sell cattle for himself sometime in 2002.  In 2003, citing a lack of competence with bookkeeping and tax preparation, he hired an accountant to prepare and file his annual tax returns for him. Defendant formed Livestock as an official entity when he filed articles of incorporation in the State of Oregon in June 2007.  Defendant is and always has been the sole shareholder, director, and officer of Livestock.  Prior to bankruptcy, Livestock's primary business was to buy and sell cattle for third parties and for itself, with Defendant brokering the transactions.

In 2003, in an effort to expand his business, Defendant partnered with the Timmermans, a family of cattle traders and feedlot operators from Nebraska and Colorado.  Members of the Timmerman family owned and operated multiple livestock-related entities including J.A. Timmerman Cattle Company and Timmerman & Sons Feeding Company.  Defendant and the Timmermans entered into an oral agreement to partner on cattle deals (hereinafter, the "Partnership").  They did not reduce the terms of their partnership agreement to writing.

MEMORANDUM OF DECISION – 4

The terms of the Partnership from 2003 to 2008 are unclear.  However, at some point in 2008, the nature of the Partnership changed such that Defendant started to invest some of his own funds in the Partnership's cattle, and he took on a role beyond that of a simple purchasing agent.  Over time, the Partnership became the primary, if not the exclusive, vehicle through which Livestock conducted its cattle-trading operations.

At some point in 2009, just as the nature of the Partnership was starting to change, Defendant met Candace Cooley (hereinafter, "Cooley"), a trucking dispatcher by trade. Shortly after they met, they started working together and also entered into a romantic relationship.  Cooley quickly became an integral part of Livestock's operations and began keeping books and records for the company.  As such, she was able to testify in great detail about the operation of the Partnership from 2009 to 2016.

Per Cooley, Defendant would buy grass cattle for the Partnership from a sell barn, normally on Wednesdays.  Cooley would use the invoices from the sell barn transaction to create a separate internal invoice on behalf of Livestock using Quickbooks.  Then she would send the Livestock invoice, and the sell barn invoice with accompanying documentation, to the Timmermans.  The Timmermans would then wire the funds to purchase the cattle to Livestock's bank account held with Plaintiff.  Livestock would use the funds from Timmerman to pay down its line of credit with Plaintiff and then write a check for the cattle out of its checking account with Plaintiff using its line of credit to fund the transaction.  This process would take a few days, so the sell barns would normally get paid roughly a week after the initial purchase.

MEMORANDUM OF DECISION – 5

One key issue that arose at trial was the extent to which the Timmermans financed the purchase of Partnership cattle. Even after trial, this issue remains unclear, but based on the record before it, the Court understands that the terms and extent of the Timmermans' financing of Partnership cattle varied substantially from deal to deal.

Per the testimony of both Defendant and Cooley, it is clear that sometimes the Timmermans would reimburse Livestock for 100% of the cost of the cattle purchased by Defendant for the Partnership. In that scenario, the Timmermans owned the cattle outright, and Defendant and Livestock had no ownership interest in the cattle themselves. However, under the terms of the Partnership, Defendant routinely retained a variable interest in the profits or losses that would emanate from the eventual sale or slaughter of a lot.[3] That interest might have been 1/3, 1/2, or some other share. *See, e.g.*, Ex. 205 (explaining the terms of a cattle deal in which the Timmermans owned 100% of the cattle and a 2/3 interest in profits and losses, while Defendant owned the remaining 1/3 interest in profits and losses).

At other times, Livestock would contribute to the financing of the cattle. In those situations, the Timmermans would reimburse Defendant for less than the full cost of the cattle Defendant purchased from the sell barns by deducting an amount of money per head of cattle. For example, in June 2012, a "Profit and Loss/Settlement" sheet produced

---

[3] Throughout the decision, "a lot" of cattle refers to an identifiable group of cattle, not a large quantity or extent. For example, "Defendant bought a lot of cattle with 315 steers in it, and it was assigned Lot # G3."

MEMORANDUM OF DECISION – 6

by Timmerman Feeding Corporation showed Defendant contributed $36,125 toward a lot of 115 cattle identified as "Lot G3490." Ex. 134 at 1590. Defendant thus contributed roughly $314 per head towards the purchase of the cattle in Lot G3490. Based on the Defendant's contribution of $36,125, and the original cost of $130,389.46, Livestock owned roughly 27% of Lot G3490, and the Timmermans owned about 73%. Defendant explained this was a common arrangement and that Livestock would regularly finance $100 per head, $200 per head, or a fixed percentage of a cattle purchase. *See also* Ex. 202F at BB0355 (describing the terms of another Partnership deal).

No matter how partnership cattle were financed, once they were purchased, they would either be placed on a pasture to be fed or sent to be fattened at Feeding's feedlot in Hazelton, Idaho, or at a Timmerman feedlot. On some occasions, the cattle would be sold directly off of the grass where they were feeding. On other occasions, the cattle would be fattened at a feedlot and then slaughtered or sold directly off the feedlot.

When a lot of cattle was sold or slaughtered, the Partnership realized its profits and losses. The Timmermans kept detailed records on each lot of cattle. When a lot of cattle was sold or slaughtered, the Timmermans would send a Profit and Loss/Settlement sheet as described above (hereinafter, a "Settlement Sheet"). Settlement Sheets reconciled revenue and expenses and included information about the cost of the cattle themselves, as well as feed costs, freight costs, doctoring costs, interest due on financed cattle, kill weights, death loss data, and whether the Partnership made a profit or loss on the lot as a whole. The Settlement Sheets also reflected any contribution made by

MEMORANDUM OF DECISION – 7

Livestock toward the cost of the cattle at the time they were purchased.  Based on

Livestock's initial investment and its entitlement to profits or losses on each lot, the

Settlement Sheets included a bottom-line figure which showed either that the

Timmermans owed Livestock money on the lot, or vice versa.

Based on the bottom line shown on the Settlement Sheets, Defendant and Cooley

testified there were a minimum of three possible outcomes: (1) the Timmermans would

owe money to Livestock and pay out the amount due in cash, (2) Livestock would owe

the Timmermans money and pay out the amount due in cash, or (3) starting in 2011, the

Timmermans would owe money to Livestock and that money would be reinvested into

the Partnership's breeding stock, which consisted of breeding "Pairs" and "Bulls."  *See,

e.g.*, Ex. 111 (Defendant testified the 464 Pairs, 148 pairs, and 40 Bulls were all

"breeding stock").  Defendant testified Livestock was building up its ownership interest

in the breeding stock in this manner from 2011 to 2016.

Thus, the Partnership included two classes of cattle: breeding stock and non-

breeding stock.  The breeding stock were a long-term asset.  Those cows were not

slaughtered and were instead used to breed more cows each year.  The non-breeding

stock consisted of purchased cattle and the offspring of breeding stock, which were short-

term assets that were fattened and later slaughtered or sold.

For years, the Partnership carried on in this manner with Livestock financing its

interests in cattle using funds from Plaintiff and the Timmermans.  From 2014 to 2016,

the prices in the cattle market allegedly began to sour with the unfortunate result that

MEMORANDUM OF DECISION – 8

Livestock started to take losses on some of the key lots of cattle from which it expected to make a profit. In the summer of 2014, a sale of what were known as "Squaw Valley Heifers" brought in less than anticipated. This caused Livestock to miss interest payments due to Plaintiff during the six to eight months prior to the issuance of a 2016 loan to Livestock under which Plaintiff increased the limit on Livestock's line of credit to $2,000,000.

Even so, Livestock pressed forward with operations. It seems the breaking point came in the summer of 2016 when profits on that year's lot of Squaw Valley heifers again failed to meet expectations. On the borrowing base certificate (hereinafter, "BBC") for September 30, 2016, Livestock and Plaintiff projected a profit of $500 per head on 3,209 Squaw Valley heifers. *See* Ex. 111 at 15. Livestock had not invested any money in the Squaw Valley Heifers on the front end but was entitled to 50% of the profits or losses on the sale of the lots. Therefore, if the $500 in profit per head was realized, Livestock stood to earn $731,230 at sale time. However, due to changes in cattle prices, Livestock allegedly lost over $50,000 on the deal.

After this substantial operational setback, things unraveled quickly for Livestock and Defendant. In September 2016, Cooley broke off her personal relationship with Defendant and moved out of their mutual home, taking a laptop that contained both Livestock and Feeding's Quickbooks records. Defendant also testified that Cooley stole hundreds of thousands of dollars when she transferred funds from Livestock and Feeding to her company, Patrone Trucking (hereinafter, "Patrone"), before she left. Separately,

MEMORANDUM OF DECISION − 9

Defendant started to have conversations about financing problems with Plaintiff's loan officer, David Stirewalt (hereinafter, "Stirewalt"). In early 2017, on Stirewalt's advice, Defendant unsuccessfully started to explore other possible sources of financing for Livestock. By the summer of 2017, the proverbial die was cast, and Defendant reported the extent of Livestock's financial woes to the Timmermans via e-mail, reassuring them that he would take care of their interests first. Ex. 107.[4]

Defendant filed his chapter 7 bankruptcy petition on November 3, 2017. By June 14, 2018, Plaintiff had foreclosed on Livestock's interests and obtained an "Amended Final Judgment and Decree of Foreclosure" in the amount of over $2,000,000 against Livestock. Ex. 101.

Per Defendant, the business of the Partnership continues in his absence. When asked what happened to the cattle existent at the time Livestock ceased to function in the summer of 2017, Defendant responded that "the cows are just being cows," suggesting the breeding stock were still alive, presumably in the possession of the Timmermans.

---

[4] Defendant confirmed at trial that he sent the e-mail in question to James Timmerman. The e-mail was dated August 30, 2017 and was included as Summary Exhibit 42 to Defendant's deposition testimony. In pertinent part, Defendant's e-mail stated:

> As we had talked in March my financial security has gotten nothing but worse . . . I have been on a cash basis with Banner sense [sic] my loan termed on the first of July making things difficult. Without a new financial institution in my future Banner is going to foreclose on me on the 1st of Oct. My first priority is to take care of you guys first . . . I want to make some moves now to try and salvage as much as we can form [sic] this deal. I would like to move as much into your guys hands as possible before I turn belly up.

Ex. 107 at Summary Ex. 42.

MEMORANDUM OF DECISION – 10

When asked what happened to the Partnership's non-breeding stock cattle that existed at the time of his bankruptcy, Defendant claimed he never received any Settlement Sheets on those lots and was otherwise unable to account for what happened to them. Plaintiff reportedly made demand on the Timmermans for the final lots of cattle Defendant had been involved with but for which he did not receive any cattle or funds in lieu of cattle from the Timmermans. Though the parties did not provide the Court with much background, apparently Plaintiff, Defendant, and the Timmermans are litigating issues related to those cattle in state court.

### 2. Banner Bank Loan #4514

Livestock borrowed money to fund its role in the Partnership from Plaintiff. The borrowing relationship started sometime in 2006 when Plaintiff extended a revolving line of credit of either $550,000 or $750,000 to Livestock as Loan #4514 (hereinafter, the "Loan"). The line of credit limit increased over time leading up to August 3, 2016, when the parties renewed the Loan and increased Defendant's limit on the line of credit to $2,000,000. Ex. 100. The August 3, 2016 renewal extended the maturity date of the Loan until July 10, 2017. *Id.* The collateral for the Loan consisted of the assets of Livestock and Feeding and was personally guaranteed by Defendant. *Id.* The loan documents required Defendant to report the monthly value of his livestock assets on a BBC template created by Plaintiff. *Id.* Stirewalt was the loan officer that managed and serviced the Loan on behalf of Plaintiff and did not testify at trial. On July 27, 2017, the Loan was extended until October 10, 2017. Ex. 147. Ultimately, Livestock failed to

MEMORANDUM OF DECISION – 11

make required payments on the Loan, and Plaintiff obtained a judgment and decree of foreclosure on June 14, 2018.  Ex. 101.

       3.  Borrowing Base Certificates

          a. Background

Under the terms of the Loan, Defendant was required to furnish financial information to Plaintiff upon request.  Since Defendant operated a cattle business, one of the primary sources of collateral for the Loan was his ownership interest in Partnership cattle.  As such, Plaintiff required Defendant to provide information about his cattle interests each month.  This information was used to create a monthly BBC that Plaintiff would use to estimate the ever-changing values of Defendant's interests in Partnership cattle.  In theory, this information could then be used by Plaintiff to assess its collateral margin by comparing the value of the cattle to the amount of the line of credit being used by Defendant at that time.

The BBCs included the following data: (1) number of head of cattle, (2) type of cattle, (3) location, (4) feedlot owner, (5) lot number, (6) weight, (7) price, (8) total value, (9) percentage ownership, (10) accounts payable, (11) net value purportedly held by Wyatt, (12) owner/partner names, and (13) comments.  *See, e.g.*, Ex. 112.

The details of exactly how the BBCs were created, and who created them, were unclear and varied depending on the time frame during which they were created.  For example, Cooley testified she started to get more involved with the creation of the BBCs

MEMORANDUM OF DECISION − 12

at some point in 2011.  Prior to that time, any BBCs that were completed were completed either annually or monthly through the cooperation of Plaintiff and Defendant.

From 2011 until approximately September 2016, Cooley prepared the BBCs and transmitted them to either Stirewalt or another of Plaintiff's employees by fax or e-mail. During those years, Defendant concedes he was ultimately responsible for the information transmitted to Plaintiff.  Even though he did not personally transmit the data directly to Plaintiff, Defendant had the final say on all of the figures Cooley provided to Plaintiff to create the BBCs.  Defendant and Cooley both reported that Cooley would go back and forth a few times with Plaintiff regarding the contents of the BBCs each month before Plaintiff would finalize the BBC.  Cooley also submitted documents to substantiate the content of the BBCs, but the details of what was supplied contemporaneously with the BBCs and what was provided after the fact were disputed at trial.

After Cooley left Livestock in fall 2016, Defendant again became solely responsible for reporting the monthly data to Plaintiff.  For at least the final eight BBCs stretching from January 2017 to August 2017, Defendant reported he would send the same data that he and Cooley had always sent to Plaintiff.  Defendant testified that, during that time, Stirewalt instructed him to forward the cattle lot data so that Stirewalt could use it to complete the BBCs each month.  Defendant claims he never saw any of the finalized BBCs from January 2017 forward until he reviewed exhibits in preparation for his testimony at trial in this case.

MEMORANDUM OF DECISION − 13

Regardless of who reported the data on the BBCs, the parties agree about the meaning and accuracy of the BBCs in many respects. For example, the parties agree that the number of head, the type, the location, the feedlot owner, the lot numbers, and weights are reliable as reported on the BBCs over the years. However, the parties vigorously dispute the way that price, total value, percent ownership, and net value were represented on the BBCs.

One of the primary sources of confusion about the prices, values, and ownership as represented on the BBCs was the distinction between "breeding stock" cattle and "non-breeding stock" cattle. Breeding stock cattle were identified on the BBCs in the "Type" column as "Pairs," and "Bulls." *See, e.g.*, Ex. 111. Breeding stock cattle were long-term assets valued according to a per head price, with the BBCs showing that Livestock owned 50% of their value. *See, e.g.*, *id.* Non-breeding stock cattle were identified on the BBCs in the "Type" column as "Mixed," "Steers," or "Heifers." *See, e.g.*, *id.* Non-breeding stock cattle were short-term assets sometimes valued on a per pound basis, with Livestock holding a variable percentage of ownership—either 33, 50 or 100%. *See, e.g.*, *id.* At other times, non-breeding stock cattle were listed with a per head value, conditioned again on a percentage of ownership and apparently based on Livestock's anticipated profit per head combined with the value of any per head contribution Livestock had made towards the purchase of the cattle on the front end. *See, e.g.*, *id.*

MEMORANDUM OF DECISION − 14

In essence, the BBCs represented a failed, one-size-fits-all attempt at estimating the monthly value of Livestock's cattle holdings. The BBCs inadequately reflected a complex set of oral ownership and profit-sharing arrangements between Defendant and the Timmermans and thus inadequately reflected the actual value of Livestock's collateral. Both parties spent a great deal of time at trial trying to establish what the BBCs actually meant in terms of value, price, and ownership, as well as who was responsible for the confusion.

b. August 15, 2017 BBC

Price and value disputes aside, the parties agree that the BBCs reflected that Defendant had at least *some* interest in certain lots of cattle. Starting with 2011, the parties agree that these interests included Defendant's ownership of breeding stock cattle. From 2011 forward, the lots of breeding stock cattle consistently carried over from month to month. *See, e.g.*, Exs. 112 and 113 (showing breeding "Cows" and "Bulls" in the same quantity and the same location on the September 2016 and October 2016 BBCs). During that same time, the non-breeding stock cattle lots would come and go as old lots were slaughtered and sold and new lots were purchased. *See, e.g.*, Exs. 118 and 119 (showing 81 "Mixed" cattle in Lot G8321 listed on the April 2017 BBC, but no longer listed on the May 2017 BBC).

Consider the final BBC in the record before the Court, dated August 15, 2017 (hereinafter, "August 2017 BBC"). Ex. 121. The August 2017 BBC reflects that Livestock had at least some form of ownership in thirteen lots of cattle and sheep. The

MEMORANDUM OF DECISION − 15

first nine rows contain information about non-breeding stock cattle including mixed cattle, steers, and heifers.  Oddly, and in contrast to previous BBCs, the first six of these nine rows do not contain a "Net Value" of the ownership interest held by Livestock even though they show Livestock as 33% or 50% partners on those six lots.  *Compare* Ex. 121 with the November 30, 2016 BBC at Ex. 113. The last four rows contain information about breeding stock including breeding pairs, bulls, ewes, and rams.

At trial, Plaintiff's counsel asked Defendant if the contents of the August 2017 BBC were an accurate representation of what Livestock owned and how much its ownership interest was worth as of August 2017.  Defendant said he did not know why there was not a "Net Value" listed on the lots of cattle described in the first six rows of the August 2017 BBC, but that he owned an interest in each of the thirteen lots of cattle and sheep listed on the August 2017 BBC.  Defendant also reaffirmed that, apart from a lot of cattle known as the Squaw Valley Heifers, he believed the prices, total values, and percentage of ownership interest of all the lots listed on the August 2017 BBC were also correct.  Therefore, the record establishes that Defendant held an ownership interest, and a value accompanying such interest, in thirteen lots of cattle and sheep comprising an estimated 6,854 head of livestock as of August 15, 2017.

The total "Net Value" of Livestock's holdings listed on the August 2017 BBC of $3,500,520 is disputed.  To begin, in light of Defendant's testimony about the first six rows of cattle that showed no net value, the actual value of Livestock's holdings theoretically could have been as high as $4,106,179.  However, Defendant candidly

MEMORANDUM OF DECISION − 16

admitted he thought the value for the Squaw Valley Heifers was too high because Livestock had not contributed toward the purchase of those cows on the front end and thus was not a 50% owner of their actual value at market.  Instead, he claimed he was a 50% owner in the profits and losses related to the Squaw Valley Heifers, and that those cows should have been listed using a flat rate per head based on anticipated profit. Defendant did not say what that flat rate per head should have been and no party adduced evidence of what Livestock's actual ownership stake really was.  Even if further evidence were to reveal that the Squaw Valley Heifers were only worth a mere $100 per head to Defendant, he still would have held at least $380,000 interest in that lot.  In the end, the primary significance of the August 2017 BBC to this Court is that it reflects, and Defendant's testimony confirms, that Livestock held an interest in thirteen lots of livestock as of August 15, 2017.

4.  Defendant's Assets: Livestock and Equipment

Livestock's primary assets were its interests in livestock, as represented on the BBCs, and its equipment and machinery as represented on financial statements and appraisals.  As a condition to the Loan, in addition to the BBCs, Plaintiff also required Defendant to submit annual financial statements that provided a summary of Livestock's assets and liabilities.  According to the "Representations and Warranties" language at the bottom of each financial statement, their purpose was to help Plaintiff assess Livestock's collateral position so Plaintiff could determine how much credit to extend to Livestock under the line of credit.  *See, e.g.*, Ex. 125 ("The information contained in this statement

MEMORANDUM OF DECISION – 17

is provided to induce [Plaintiff] to extend or continue the extension of credit to [Defendant] or to others upon the guarantee of the undersigned.").

The financial statements included information about the value of Livestock's livestock, its equipment and vehicles, and the extent of its debts.  Livestock values were taken directly from a BBC issued at or near the same time as each financial statement. Equipment and machinery were itemized in greater detail with a description of each piece of equipment and its corresponding value.

At trial, witness testimony regarding financial statements focused on the June 14, 2016 financial statement Defendant provided to Plaintiff (hereinafter, "June 2016 Financial Statement"), which appears to have been the last financial statement exchanged between the parties.  Ex. 125.  While Defendant, Cooley, and Plaintiff's senior vice-president, Bruce Nelson (hereinafter, "Nelson") testified at great length about the status of various items of equipment listed on the June 2016 Financial Statement, no party produced documentary exhibits to support witness testimony.  The witnesses were assertive and clear about the whereabouts of some equipment, such as the Peterbilt trucks, but tepid and unclear about the whereabouts of most of the other equipment.  The June 2016 Financial Statement showed Livestock had $2,794,062 in livestock held for sale, $1,087,050 in equipment and machinery, $11,000 in miscellaneous livestock, and $2,484,868 in total liabilities.  Ex. 125.  On the whole, the June 2016 Financial Statement showed Livestock had a net worth of $1,414,466 on June 14, 2016.  *Id.*

MEMORANDUM OF DECISION – 18

Cooley testified to her best recollection of the disposition of each piece of equipment. She said that four of the trucks (the 1978 Peterbilt, the 1997 Peterbilt, the 2007 Peterbilt, and the 2008 Peterbilt) had been traded in prior to June 2016. She testified that the 1997 Volvo listed was destroyed "years" prior to June 2016. She said the 2012 Peterbilt was sold with Plaintiff's permission in December 2016. She claimed Patrone was the rightful owner of the three 2016 Peterbilt trucks. Additionally, Cooley alleged some of the items on the June 2016 Financial Statement were owned and financed by Feeding, not Livestock. Lastly, Cooley claimed Defendant took some of the equipment listed on the June 2016 Financial Statement to a neighboring farm to hide it, but she did not specify when this happened or what items of equipment had supposedly been concealed.

Defendant conceded he did not review the June 2016 Financial Statement before submitting it to Plaintiff and that it was prepared by Defendant's accountant, who used information emanating from an outdated depreciation schedule. Like Cooley, Defendant also provided his best guess as to the status of each piece of equipment listed on the June 2016 Financial Statement. Defendant agreed that the four Peterbilt trucks identified by Cooley had indeed been traded in prior to June 2016 and should not have been included on the June 2016 Financial Statement. Defendant also agreed the 1997 Volvo had been destroyed prior to June 2016, and the 2012 Peterbilt was sold in late 2016. Defendant conceded Patrone made the payments on the three 2016 Peterbilt trucks (save for one payment in July 2016) and did not seriously challenge Cooley's assertion that Patrone

MEMORANDUM OF DECISION – 19

was the rightful owner of those trucks.  Beyond that, Defendant denied he hid any of the equipment on a neighboring farm and asserted that, to the best of his knowledge, much of the equipment was still sitting out at the feedlot in Hazelton, Idaho, at the time of trial.

Hoping to recover some of the equipment listed on the June 2016 Financial Statement to satisfy its judgment against Defendant, Plaintiff obtained a writ of execution on June 12, 2018, which caused the Jerome County Sheriff to go to Standlee Hay Company in Kimberly, Idaho, in an attempt to seize some of Livestock's assets.  Ex. 102. On July 19, 2018, the Jerome County Sheriff produced an "Unsatisfied Return of Service" reporting that it was unable to find any of Livestock's assets at that location. Ex. 103.  Nelson reported Plaintiff was not able to otherwise seize any of the equipment collateral through further, unspecified efforts, such as those of Plaintiff's agent, Ron Jones.

On September 14, 2017, Patterson Appraising appraised Livestock and Feeding's vehicles and equipment.  Patterson valued Livestock's equipment and vehicles at $195,150 and Feeding's equipment and vehicles at $222,015, for a total value of $417,225.  Exs. 131, 132.  The value of Feeding's equipment and vehicles is relevant because it was also part of Defendant's collateral for Livestock's Loan.  The values on the Patterson appraisals can be contrasted with the $1,087,050 value of Livestock's equipment and vehicles shown on the June 2016 Financial Statement and the $1,978,812 value of both Livestock and Feeding's equipment and vehicles shown on a combined

MEMORANDUM OF DECISION − 20

financial statement prepared on June 30, 2017 (hereinafter, "June 2017 Combined

Financial Statement").  Exs. 125, 126.

###### 5.  Defendant's Record Keeping

Defendant and Cooley both testified they kept limited records of Livestock's

business activities.  Defendant testified he had spent most of his life on a cattle ranch and

did not have education or experience in bookkeeping, accounting, or income tax

preparation.  As such, Defendant frequently relied on third parties, including Cooley, the

Timmermans, Plaintiff, and an unnamed accountant, to create and preserve records of

Livestock's business activities.  Accordingly, most of the records related to Livestock

produced at trial were generated or kept by Cooley on behalf of Livestock or by third

parties, such as the Timmermans and Plaintiff.

Prior to Cooley's involvement with Livestock's books in 2011, the primary record

of Livestock's business activities was the check register kept by Defendant.  From 2011

until Cooley's departure in fall 2016, Cooley was generally responsible for Livestock's

books and records and maintained what few records Livestock kept.  Cooley testified she

put some information from Defendant's check register into Quickbooks but did not

provide further details about what specific records those files might contain.  Cooley said

Livestock's records were frequently destroyed shortly after they were sent to Plaintiff.

After Cooley's departure, as Livestock's operations faltered in late 2016 and early 2017,

it appears Defendant kept very few records of Livestock's business activities.

MEMORANDUM OF DECISION − 21

As discussed earlier, per Cooley, from 2011 forward, at the beginning of a cattle deal with the Timmermans, Defendant would buy cattle for the Partnership from a sell barn. Then Cooley would send invoices to the Timmermans to facilitate some level of reimbursement on the cattle purchase. A brand inspection report would be produced any time cattle were purchased, moved from state to state, or slaughtered.

Next, the purchased cattle were transported and fed. This generated freight bills from Patrone and feed bills from Feeding and Timmerman feedlots. As the cattle were fattened, Defendant testified there were records of "weekly yard sheets," "lot sheets," and "kill reports."

When cattle were slaughtered, the Timmermans would produce a Settlement Sheet accounting for the income and expenses related to the slaughtered lot. The Settlement Sheets incorporated the terms of whatever partnership Defendant and the Timmermans had agreed to at the outset of a cattle deal. Throughout this process, funds would flow in and out of Livestock's bank account, which was maintained with Plaintiff. Thus, there were monthly bank account statements related to Livestock's operations as well.

As previously discussed, Defendant and Cooley worked with Plaintiff's agents to generate BBCs each month, which are also relevant to understanding Livestock's business activities. Additionally, Livestock used an accountant to file its annual income tax returns, which presumably included information about Defendant's business activities.

MEMORANDUM OF DECISION − 22

Ultimately, Defendant introduced thousands of pages of poorly organized exhibits into evidence at trial, but in view of witness descriptions of the records that were generated as Livestock conducted its business, admitted exhibits did not include all of the records related to Livestock's business activities. For example, the records included very few Settlement Sheets and contained almost no documents explaining the ownership shares and partnership agreement for each Partnership cattle deal. Many of Defendant's exhibits were marked with a "BB" Bates stamp, suggesting the records came from Plaintiff's files.

### *Analysis and Disposition*

In Counts II and IV of its complaint, Plaintiff asks the Court to deny the Debtor his bankruptcy discharge as to all debts under § 727(a)(3) and § 727(a)(5). Dkt. No. 1. As this Court has stated before: "[A] total bar to discharge is an extreme penalty, and reasons for denial of a discharge must be real and substantial rather than technical and conjectural." *Adams v. McKay (In re McKay)*, 504 B.R. 649, 654 (Bankr. D. Idaho 2014) (internal citations omitted). "Those objecting to discharge 'bear the burden of proving by a preponderance of the evidence that [the debtor's] discharge should be denied.'" *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010). "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." *Id.* (citing *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996)).

MEMORANDUM OF DECISION − 23

*A. Failure to Explain Loss of Assets or Insolvency: § 727(a)(5)*

>    1.  Legal Standard

Under § 727(a)(5), "[t]he court shall grant the debtor a discharge, unless . . . the

debtor has failed to explain satisfactorily, before determination of denial of discharge

under this paragraph, any loss of assets or deficiency of assets to meet the debtor's

liabilities[.]"  Under this subsection:

> [A]n objecting party bears the initial burden of proof and must demonstrate:
> (1) debtor at one time, not too remote from the bankruptcy petition date,
> owned identifiable assets; (2) on the date the bankruptcy petition was filed
> or order of relief granted, the debtor no longer owned the assets; and (3) the
> bankruptcy pleadings or statement of [financial] affairs do not reflect an
> adequate explanation for the disposition of the assets.

*Retz,* 606 F.3d at 1205 (citing *Olympic Coast Inv. Inc. v. Wright (In re Wright)*, 364 B.R.

51, 79 (Bankr. D. Mont. 2007)).  "Once the creditor has made a prima facie case, the

debtor must offer credible evidence regarding the disposition of the missing assets."  *Id.*

(citing *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 754 (9th Cir.

1985)); *see also Leimbach v. Lane (In re Lane)*, 302 B.R. 75, 82 (Bankr. D. Idaho 2003)

("Plaintiff must initially show that a specific asset is missing . . . [i]f the creditor

identifies a missing asset, it is incumbent upon a debtor to provide a satisfactory

explanation concerning what happened to that asset.").

>    2.  Analysis

At bottom, Plaintiff argues Defendant failed to explain the loss of two types of

assets.  First, Plaintiff contends Defendant failed to explain the loss of his interests in the

cattle that Livestock owned in the months leading up to the filing of his bankruptcy

MEMORANDUM OF DECISION − 24

petition.  Dkt. No. 106 at 18.  Second, Plaintiff argues Defendant failed to explain the

loss of some of the equipment and vehicles Defendant claimed he owned on the June

2016 Financial Statement.  *Id.* at 16–17.

> a. Livestock's Interests in Cattle

Here, Defendant testified he owned an interest in the lots of cattle listed on the

August 2017 BBC.  The August 2017 BBC was not too remote in time from the

bankruptcy petition date as it was issued less than three months before Defendant's

bankruptcy filing.  While the parties dispute the value and extent of Livestock's cattle

interests as represented on the August 2017 BBC, no party alleged, nor did any witness

testify, that Defendant did not own at least some interests in cattle in August 2017.

However, Plaintiff failed to meet its burden of proving Defendant no longer

owned his interests in cattle at the time of his bankruptcy petition.  Evidence at trial

revealed that the ownership of Livestock's interests in cattle remains disputed and is the

subject of a multi-party state court lawsuit involving Plaintiff, Defendant, and the

Timmermans.  The parties provided few details about the state court lawsuit, such as its

filing date, a clear identification of the parties involved, or a clear identification of the

specific issues being litigated.  However, Nelson testified that Plaintiff considered and

rejected a cash settlement offer from the Timmermans.  Nelson reported that the

Timmermans' initial offer was to give Plaintiff $460,000 based on amounts due

Livestock in exchange for a release of Plaintiff's claims against the Timmermans.  Per

MEMORANDUM OF DECISION − 25

Nelson, the offer was later lowered to $225,000 because the Timmermans claimed offsets from losses suffered in the Partnership with Defendant.

Again, the Court emphasizes it is left with a scant record of what is going on in state court, but the best evidence before the Court, in the form of testimony from Nelson, is that the extent of Livestock and Defendant's interests in the cattle at the time of bankruptcy is the subject of litigation with stakes "in the millions." Thus, the Court must presume that one possible outcome of that litigation is a determination that Livestock still owned some or all of the cattle interests that it asserted it owned in August 2017 as of the petition date. Furthermore, when asked about the disposition of the cattle, Defendant replied he believed the "cows are still just being cows," and that he never received any Settlement Sheets accounting for what happened to the cattle lots listed on the August 2017 BBC. This also suggests it is possible Defendant's interests in cattle still exist, though the extent of those interests is unclear.

Therefore, the Court finds Plaintiff failed to prove Defendant no longer owned an interest in Partnership cattle as of the petition date. While Plaintiff would likely concede Livestock owned some interest in cattle at the time Defendant filed his petition, it claims Defendant does not own the $3,500,520 in cattle interests listed on the August 2017 BBC. Again, this argument goes to the actual value of Defendant's interest in the cattle, and the extent to which the value of those interests might have been misrepresented on the August 2017 BBC, but not to whether Defendant no longer owned one of the lots of cattle listed on the August 2017 BBC. The August 2017 BBC may well include

MEMORANDUM OF DECISION – 26

misstatements and reflect an unrealistically high value for the lots of cattle Livestock owned, but this does not mean Defendant no longer owned an interest in the lots of cattle identified therein. As such, while Plaintiff may have made some headway at trial as far as showing the values listed on the August 2017 BBC are inflated, it failed to meet its burden of proving Defendant owned an interest in a specific lot of cattle in August 2017 that he no longer owned when he filed his petition on November 3, 2017.

b. Livestock's Interests in Equipment and Vehicles

Next, the Court will discuss whether Plaintiff proved Defendant failed to explain what happened to the equipment and vehicles he represented Livestock owned on the June 2016 Financial Statement. Here, Plaintiff relies on the itemization found on the June 2016 Financial Statement as evidence of what Defendant owned in the not-too-distant past. *See* Dkt. No. 125. The June 2016 Financial Statement was signed by Defendant in August 2016. Defendant's accountant prepared the June 2016 Financial Statement, and Defendant only conducted a cursory review of its contents. Defendant and Cooley testified they believed Defendant at one time owned all of the equipment and vehicles listed on the June 2016 Financial Statement with some limited exceptions. They were unable to assert with any confidence that Defendant owned four of the trailers included in the equipment list: Those trailers were the "Merritt Trailer," the two "2005 Wilson Trailers (50%)," and the "2012 Wilson Trailer." Even so, the Court finds Plaintiff has met its burden of showing Defendant once owned identifiable assets as listed on the June 2016 Financial Statement, except for the four trailers mentioned above, and

MEMORANDUM OF DECISION – 27

will use the equipment listed on that statement as a starting point for the analysis that follows.

Next, Plaintiff must show Defendant no longer owned some of those identifiable assets on the date of the petition. Defendant and Cooley both testified that many of the assets Livestock alleged it once owned were no longer owned by Livestock as of the date of the petition. For example, Defendant and Cooley testified neither Livestock nor the Defendant owned the "1978 Peterbilt," the "1997 Peterbilt," the "2007 Peterbilt," and the "2008 Peterbilt" on the date of the petition because they were previously traded in on other trucks. They both also testified that the "1997 Volvo" had been scrapped years earlier. Defendant conceded that Patrone, and thus Cooley, owned and possessed all three of the "2016 Peterbilts" on the date of the petition. As such, the Court finds that, as of the petition date, Defendant did not own eight of the nine trucks listed on the June 2016 Financial Statement: These trucks are the 1978, 1997, 2007, and 2008 Peterbilts, the 1997 Volvo, and all three 2016 Peterbilts.

There may well have been other equipment on the June 2016 Financial Statement that Defendant did not own on the petition date, but the timing of dispositive events related to the equipment was left unclear even after trial. For example, Defendant and Cooley testified the "ENG Trailer" was repossessed, but it was unclear whether the repossession occurred before or after the petition date. The same is true of the "JD Tractor." Also, Defendant testified Cooley owned the "MF 1130 Tractor," though Cooley testified it was owned by Livestock. Since the details and timing related to the

MEMORANDUM OF DECISION – 28

disposition of the ENG Trailer, the JD Tractor, and the MF 1130 Tractor are unclear, the Court cannot find Defendant did not own those pieces of equipment on the date he filed his petition. The 2015 Wilson Trailer was sold at some point, and while the date of sale is unclear, the parties accounted for that piece of equipment.

Otherwise, Defendant testified that, at the time of his bankruptcy filing, the remaining equipment listed on the June 2016 Financial Statement was still on site at the feedlot in Hazelton, Idaho. Plaintiff contends that, in an effort to collect on its judgment against Defendant, the Jerome County Sheriff unsuccessfully attempted to collect some of the equipment itemized on the June 2016 Financial Statement on Plaintiff's behalf. In support of this contention, Plaintiff offers a copy of the Writ of Execution, Ex. 102, and the Jerome County Sheriff's "Unsatisfied Return of Service" dated July 19, 2018. However, the "Unsatisfied Return of Service" shows the Sheriff went out to Standlee Hay Company at 22349 Kimberly Road, Suite E, in Kimberly, Idaho, and not to the feedlot in Hazelton, Idaho, where Defendant claims much of the equipment was and is kept. In the absence of more background information about why it is significant that the Sheriff did not find any of the disputed equipment at Standlee Hay Company in July 2018, the Court does not find these exhibits persuasive. Apart from the eight trucks, Plaintiff failed to clearly establish Defendant did not own any other equipment listed on the June 2016 Financial Statement as of the date of his bankruptcy petition.

Based on the foregoing, Defendant's pleadings and statement of financial affairs must account for each of the eight aforementioned trucks. The statement of financial

MEMORANDUM OF DECISION – 29

affairs indicates that "Candice Cooley transferred trucks from Wyatt Livestock" on

December 28, 2016.  BK Dkt. No. 14 at 43.  However, the statement of financial affairs

does not explain which specific trucks were transferred.  The Court's review of the

docket reflects that no other pleading provides further details on the truck transfers.  As

such, the Court finds Plaintiff has sustained its burden of showing the pleadings and

statement of financial affairs do not account for the eight trucks Wyatt did not own on the

petition date.

Since Plaintiff has established a prima facie case under § 727(a)(5), the burden

shifts to the debtor to offer credible evidence regarding the disposition of the trucks.

Defendant and Cooley both testified that the 1997 Volvo was destroyed years before the

petition date.  They also both testified that the 1978, 1997, 2007, and 2008 Peterbilts

were traded in on the three 2016 Peterbilts prior to the date of the petition.  Lastly,

Defendant and Cooley both testified that, on the date of the petition, even though the

three 2016 Peterbilt trucks may have been financed in Livestock's name for tax purposes,

they were owned and possessed by Cooley.  Defendant testified that he was referring to

the transfer of these three trucks in his statement of financial affairs.  As such, the Court

finds that Defendant has offered sufficient evidence explaining what happened to the

assets he no longer owned on the petition date.  Accordingly, Plaintiff's claim under

§ 727(a)(5) fails in regard to the equipment and vehicles listed on the June 2016 Financial

Statement.


MEMORANDUM OF DECISION − 30

Plaintiff also argues Defendant should lose his discharge under § 727(a)(5) because the June 2016 Financial Statement showed a net worth of $1,414,466 whereas Defendant's schedules claim that his interest in Livestock is worth $0. Ex. 125; BK Dkt. No. 14 at 7, 9. Along similar lines, Plaintiff argues Defendant must account for the difference between the $1,978,812 in equipment and vehicles he claimed Livestock and Feeding owned on the June 2017 Combined Balance Sheet, Ex. 126, and the $417,225 in equipment and vehicles it claimed Livestock and Feeding owned based on the Patterson appraisals completed on September 14, 2017. Exs. 131, 132.

The Court rejects these arguments because the burden under § 727(a)(5) is to point to a specific asset that Defendant owned not too remotely from the petition date, and then show he did not own it anymore on the petition date and that he did not account for it in his schedules or statement of financial affairs or later explain the disposition of the asset through evidence at trial. Pointing to changes in the value of assets and net worth does not establish that a given asset went missing. Therefore, the Court has considered each of the disputed assets specifically identified by Plaintiff and finds that no specific asset remains unexplained. Moreover, evidence at trial revealed many valid reasons for the discrepancies between the (1) June 2016 Financial Statement and Defendant's schedules, and (2) the June 2017 Combined Balance Sheet and the Patterson appraisals, none of which change the Court's analysis of the disposition of the cattle, vehicles, and

MEMORANDUM OF DECISION – 31

equipment identified by the Plaintiff under § 727(a)(5).[5]  Accordingly, discharge will not

be denied on the basis of § 727(a)(5).

*B. Failure to Keep or Preserve Books or Records: § 727(a)(3)*

    1.  Legal Standard

Under § 727(a)(3):

> The court shall grant the debtor a discharge, unless . . . the debtor has
> concealed, destroyed, mutilated, falsified, or failed to keep or preserve any
> recorded information, including books, documents, records, and papers,
> from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all of the
> circumstances of the case.

"The purpose of § 727(a)(3) is to make discharge dependent on the debtor's true

presentation of his financial affairs."  *Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re

Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008) (citing *Lansdowne v. Cox (In re Cox)*, 41

F.3d 1294, 1296 (9th Cir. 1994)); *see also Mckay*, 504 B.R. at 654.  While "[t]he statute

does not require absolute completeness in making or keeping records . . . the debtor must

'present sufficient written evidence which will enable his creditors reasonably to

ascertain his present financial condition and to follow his business transactions for a

reasonable period in the past.'"  *Id.* (quoting *Rhoades v. Wikle*, 453 F.3d 51, 53 (9th Cir.

1971)).

---

[5] For example, Defendant argues that $997,198 of the discrepancy is due to Plaintiff's failure to consider
depreciation.  *See* Dkt. No. 107 at 22.  Defendant also contends that Plaintiff's comparisons also fail to
consider the transfer of the three 2016 Peterbilt trucks.  *Id.* at 23.  While the Court stops short of finding
any facts related to the parties' arguments about the differences in values listed on these exhibits, it
acknowledges Defendant raised plausible arguments accounting for such differences.

MEMORANDUM OF DECISION − 32

To state a prima facie case under § 727(a)(3), the Plaintiff has the burden of proving "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." *Id.* (quoting *Cox*, 41 F.3d at 1296); *see also McKay*, 504 B.R. at 654. Once the Plaintiff makes such a showing, "the burden of proof shifts to the debtor to justify the inadequacy or nonexistence of the records." *Id.* (quoting *Cox*, 41 F.3d at 1296). "Justification for [a] bankrupt's failure to keep or preserve books or records will depend on . . . whether others in like circumstances would ordinarily keep them." *Id.* at 762 (quoting *Cox*, 41 F.3d at 1299). It is not enough for the debtor to honestly produce all the records in his possession. *Id.* Rather, the debtor must "produce such records as are customarily kept by a person doing the same kind of business, or that he shall satisfy the bankruptcy court with adequate reasons why he was not duty bound to keep them." *Id.* (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992)).

2.  Analysis

Next, the Court will discuss Defendant's efforts to keep or preserve books and records under § 727(a)(3). Defendant introduced thousands of pages of records in its exhibits at trial. Many of those records pertain to Livestock's business activities but were produced out of Plaintiff's files. The voluminous, haphazardly organized business records found in Exhibit 202 appear to be the Defendant's best effort at establishing a paper trail regarding his material business transactions in the months and years leading up to his bankruptcy filing. The records consist primarily of feed bills, BBCs, loan histories,

MEMORANDUM OF DECISION – 33

incoming and outgoing cattle reports, and e-mails between Livestock, Defendant, Cooley, the Timmermans, Plaintiff, and third parties.

The Court finds that these records do not make it possible to ascertain the Debtor's present financial condition or to track his material financial transactions for a reasonable period into the past.  Specifically, the Court finds that to enable Plaintiff to properly understand Defendant's present financial condition and material business transactions, Defendant bore a burden of keeping records regarding the disposition of each of the lots of cattle identified on the BBCs.  One key source of such records was the Settlement Sheets from the months and years leading up to Defendant's bankruptcy filing, which Defendant testified were routinely issued after a lot of cattle was slaughtered or sold.  At trial, Defendant repeatedly explained that Settlement Sheets accounted for: (1) the expenses and revenues related to each lot of cattle, (2) the relative shares of ownership of the cattle as between Defendant and the Timmermans, (3) the profits and losses associated with the sale or slaughter of those cattle, and (4) a bottom-line figure due Defendant or the Timmermans as a result of all of the above.  Sometimes, that bottom-line amount would be paid to Livestock.  *See, e.g.*, Ex. 202F at 1590. At other times, the bottom-line amount was reinvested into the Partnership breeding stock.  *See, e.g.*, Ex. 202F at 252.

Based on the foregoing, the Court finds that, among thousands of pages of records admitted into evidence, the Settlement Sheets remain, for the most part, conspicuously absent from the record.  The Court searched admitted exhibits exhaustively and was only

MEMORANDUM OF DECISION − 34

able to identify three Settlement Sheets from 2015 found in Ex. 202F at BB244, BB252, and BB282, and a fourth Settlement Sheet from 2012 in Ex. 134 at TDEF1590. The Court was unable to locate any Settlement Sheets from 2016 or 2017.

Livestock's primary business was buying, raising, and selling cattle through the Partnership. The Settlement Sheets are the definitive documents that would enable a creditor to assess Livestock's profits and losses, its cash flow, and the extent of its accruing interest in Partnership breeding stock. Thus, the Settlement Sheets were absolutely crucial in terms of ascertaining the Livestock and the Defendant's present financial condition and their historical material business transactions.

Defendant did not produce the Settlement Sheets regarding the lots of cattle identified on the August 2017 BBC. No other record explains why such Settlement Sheets do not exist. Defendant explained he believed the cattle listed on the August 2017 BBC were "still being cows," but he completely failed to produce records explaining what happened to those cows.

The Court is concerned that it was unable to identify any document or combination of documents in the record that could fully account for the value of Defendant's interest in the breeding stock. Defendant claimed he had been reinvesting his cattle profits into the breeding stock since 2011, but he adduced no document or record showing what his interest in those cattle was at the time of his bankruptcy. The BBCs from 2011 to 2016 regularly indicated Defendant owned 50% of the breeding stock lots, but this is problematic because Defendant also said he was slowly growing his

MEMORANDUM OF DECISION − 35

percentage interest in the breeding stock over time. *Compare* Ex. 202F at BB252, which reconciles the profit on Lot G5283, and indicates "Wyatt and Timmerman Ranch Calves Balance to be applied to Partnership Breeding Stock", with Exs. 202F at BB239 (the September 15, 2015 BBC) and 202F at BB232 (the October 15, 2015 BBC), which show Defendant's percentage interest in the breeding stock remained unchanged before and after any adjustment for the accrual of Defendant's financial interest in the Partnership breeding stock based on the final disposition of Lot G5283 on September 17, 2015. Defendant also failed to provide records showing what happened to the non-breeding stock lots listed on the August 2017 BBC and other lots of cattle listed on previous BBCs in the months and years leading up to the date of his petition. Based on the foregoing, the Court finds Plaintiff has made a prima facie showing under § 727(a)(3).

In the face of such a showing, the burden shifts to Defendant to justify the inadequacy or nonexistence of records. As to the non-breeding stock cattle, Defendant claimed "he never saw a closeout" on the lots of cattle identified on the August 2017 BBC. By this, the Court infers Defendant is saying he never got any Settlement Sheets or other reconciliation accounting for the disposition of those lots. While this response leaves the Court wondering what happened to Defendant's interest in those lots of cattle, it does provide at least some explanation of the absence of Settlement Sheets accounting for the disposition of those lots.

This possible justification for the absence of records accounting for the lots listed on the August 2017 BBC was buttressed by Nelson's testimony. Nelson said that

MEMORANDUM OF DECISION – 36

Plaintiff, Defendant, and the Timmermans are litigating issues pertaining to the cattle listed on the August 2017 BBC in state court.  However, Nelson provided scant details about the nature of the state court litigation, and Defendant did nothing to supplement the Court's understanding of how the state court litigation might explain the extent and disposition of Livestock's interests in the cattle in the months leading up to Defendant's bankruptcy.

Even so, whatever is going on in state court does not justify the near-complete absence of any records about Partnership cattle lots slaughtered and sold in previous months and years, nor does it explain the complete absence of records about the extent and value of Defendant's ownership interest in the Partnership breeding stock.

Again, such Settlement Sheets, or reasonably equivalent substitute records, are absolutely necessary to ascertain the nature of Defendant's present financial condition and his historical material business transactions for a reasonable period into the past. Without the Settlement Sheets, any party trying to understand Livestock's business transactions would be at a loss to determine whether a given lot of cattle resulted in a profit or a loss, the extent of such profit or loss, and how much if any of such profit was reinvested into the Partnership breeding stock as opposed to being paid out in cash.  If Defendant was, as he testified, building up Livestock's equity in the Partnership breeding stock over time, he was duty bound to keep records about that equity.  Otherwise, it would be impossible for any party to understand how much Livestock's interest in the breeding stock was actually worth.

MEMORANDUM OF DECISION − 37

The extent of Livestock's interest could easily have been documented in a minimum of two ways.  First, Defendant could have maintained and preserved the Settlement Sheets that show how and when his profits and losses from non-breeding stock cattle were credited or debited towards his equity in the Partnership breeding stock. Alternatively, the Plaintiff could have supplied a summary ledger or accounting showing the transactions relevant to the development of his interest in the Partnership breeding stock.  The Court finds no such documents in the record before it.

Defendant asserts his failure to keep and preserve proper records was justified because he kept records as others in like circumstances would ordinarily keep them. However, Defendant produced no evidence of the existence of such a community standard for similarly situated cattle ranchers.  In the absence of such evidence, the Court presumes that cattle ranchers, like other businesspersons, keep at least enough records to determine the disposition of the major assets crucial to the operation of their businesses. This is especially true where, as here, the cattle rancher needs to provide financial information about his business in order to obtain bank financing.

Lastly, Defendant testified Cooley took a laptop with some of Livestock's business records with her when she left in fall of 2016.  However, no evidence or testimony ever explained what specific records were maintained on that laptop and why the absence of the laptop might constitute an excuse for Defendant's failure to maintain and preserve adequate business records.  As such, the absence of the laptop does not justify Defendant's failure to maintain and preserve records.  Therefore, based on this

MEMORANDUM OF DECISION − 38

record, the Court finds Defendant failed to keep and preserve records accounting for the value of Livestock's interest in the Partnership breeding stock, its interests in previous lots of Partnership cattle that were slaughtered and sold, and the cash transactions related thereto. Defendant failed to justify the absence of such records. Therefore, the Court finds that the Defendant's bankruptcy discharge shall be denied under § 727(a)(3).

*C. False Pretenses, False Representation, or Actual Fraud: § 523(a)(2)(A) and Materially False Written Statements: § 523(a)(2)(B)*

Lastly, Plaintiff sought the denial of Defendant's discharge as to debts owed specifically to Plaintiff, arguing that the Loan was obtained by false pretenses, a false representation, or actual fraud under § 523(a)(2)(A), or that the Loan was obtained by means of Defendant's materially false written statement respecting his financial condition under § 523(a)(2)(B).

Since the Court has already found that Defendant shall not receive a bankruptcy discharge because of his failure to preserve and maintain records that would allow creditors to ascertain his present financial condition and his material financial transactions under § 727(a)(3), the Court will not address the parties' arguments regarding the dischargeability of debtor's debt to Plaintiff under § 523(a)(2)(A) and (B).

### *Conclusion*

Plaintiff has shown that Defendant, without justification, failed to keep and preserve records necessary to ascertain present financial condition and his material business transactions under § 727(a)(3). Defendant's discharge is therefore denied.

Plaintiff failed to prove Defendant failed to explain the loss or deficiency of his assets

MEMORANDUM OF DECISION – 39

under § 727(a)(5).  Since Plaintiff prevailed on its cause of action under § 727(a)(3), the

Court did not address Plaintiff's arguments under § 523(a)(2)(A) and (B).  A separate

order will be entered.

DATED:  August 21, 2019

JOSEPH M. MEIER
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION − 40